IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-02525-WYD-MEH

RICHARD G. CHAVEZ,

    Plaintiff,
v.

DARREN HATTERMAN, Adams County Deputy Sheriff, in his individual capacity;
ROBERT CORTEZ, Adams County Deputy Sheriff, in his individual capacity; and
JOHN TOTTEN, Adams County Deputy Sheriff (Sgt.), in his individual capacity,

    Defendants.

---

**RECOMMENDATION ON DEFENDANT CORTEZ'S MOTION TO DISMISS
AND/OR MOTION FOR SUMMARY JUDGMENT**

---

Before the Court is Defendant Cortez's Motion to Dismiss and/or Motion for Summary Judgment [Docket #104]. Pursuant to 28 U.S.C. § 636(b)(1)(A) and D.C. COLO. L.Civ.R 72.1.C, this matter has been referred to this Court for recommendation. For the reasons stated below, the Court recommends that the District Court **grant** Defendant's Motion.

**I.    Facts**

The following facts are undisputed, unless otherwise noted. Plaintiff was arrested on December 7, 2004, while participating in a burglary at the address of 5335 Pecos, Denver, Colorado. Plaintiff had recently escaped from a community corrections drug and alcohol treatment facility and was under the influence of alcohol and amphetamines. At the time of his arrest, Plaintiff complained that he could not close his hands together behind his back because of a prior shoulder injury. As a result, two sets of handcuffs linked together were used to secure Plaintiff's hands behind his back, thus leaving his hands farther apart than they would have been if only one pair of handcuffs were used. Plaintiff informed the arresting officers that another person was involved in the burglary, and

this information was broadcast over the police radio at approximately 4:17 p.m. Defendant Deputy Hatterman then escorted Plaintiff to his patrol car. While doing so, Plaintiff informed Deputy Hatterman that the other person involved in the burglary was named Jason and that he had a gun. It was aired over the police radio at 4:28 p.m. that the additional suspect was possibly armed, and a request was made for additional police units to respond. Deputy Cortez heard this broadcast. Motion, Exh. A-4 at ¶ 3; Dock. #104-5 at 3.

Deputy Hatterman then turned with Plaintiff to return to the other deputies, and Plaintiff fell to the ground and claimed that he landed on and hurt his neck. In response, Deputy Hatterman advised Plaintiff that he would call an ambulance. Plaintiff was then placed in Deputy Hatterman's patrol car and driven one block away to 53rd and Tejon. In his deposition, Deputy Hatterman testified that this was due to concern about the second suspect described by Plaintiff. Plaintiff disputes this reasoning and points to Detective Hinrich's Police Report in which Detective Hinrich states, "Deputy Barrett stated a suspect was arrested and Adams County Deputy Darren Hatterman was going to transport the suspect to the Substation." Response, Appx. B, Dock. #111-2 at 21. During the one-block drive, or at least prior to Deputy Hatterman getting out of the patrol car, he radioed for an ambulance for Plaintiff. Deputy Hatterman called for the ambulance at 4:34 p.m. After stopping the patrol car, Deputy Hatterman got out of the front seat of the patrol car and opened the back door.

Plaintiff testified in his deposition that, prior to Deputy Hatterman opening the back door, Plaintiff had pulled the handcuffs in front of him so that his hands were no longer secured behind his back. Motion, Exh. A-2 at 53, Dock. #104-3 at 16. Plaintiff states that he did so to alleviate the pain in his shoulder. *Id.* He described his decision as follows:

> Q: Did you think there was any problem with bringing your cuffs to the front?
>
> A: Hell, no. I'm the one that's in the right, in the back. I'm the one that has to – I'm not gonna sit there with the handcuffs behind my back for whatever length of time that it's gonna take to take me to Adams County jail, you know.
>
> Q: Do you think that that's your decision to make, where you want your cuffs?
>
> A: Well in my position, yes, it is my decision to make.
>
> Q: When you were placed in the cuffs originally, did you ask them to cuff you in the front?
>
> A: No.
>
> Q: Why not?
>
> A: Didn't say – I asked him — he was already cuffing me in the back. I told him two cuffs.
>
> Q: Did you think that there was probably some reason that they cuffed you in the back?
>
> A: Look, I've been getting cuffed for years, okay? And getting handcuffed in the back is standard procedure, okay? So when he put on two cuffs, that was great. That's all well and good. When I pulled the handcuffs to the front, that was for my comfort, because I'm already in the back of a caged, secure squad car, unable to do anything. I'm on my way to jail. I might as well be comfortable.

Response, Exh. A-3 at 53-54; Dock. #111-3 at 17.

Plaintiff knew that, by moving his hands to the front, he had the ability to strike someone, and that it was safer for Deputy Hatterman when Plaintiff's hands were behind his back. *Id.* at 56; Dock. #104-3 at 19. Deputy Hatterman stated that he opened the back door to assist Plaintiff, while Plaintiff states that Deputy Hatterman had threatened to kill Plaintiff if he was lying about the second suspect. Response, Exh. A-3 at 58; Dock. #111-3 at 18. These differing views are irrelevant to this Motion for Summary Judgment, because Defendant Cortez was not at the scene at this time,

3

and it is undisputed that at some point after Deputy Hatterman opened the back door, Plaintiff and Deputy Hatterman engaged in a struggle for control of Deputy Hatterman's gun. Plaintiff admits that he attempted to gain possession of the gun and that he engaged in a physical struggle with Deputy Hatterman for the gun. Ultimately, both Deputy Hatterman and Plaintiff ended up outside the patrol car on the ground, where the struggle continued. During this struggle, the gun discharged.

Deputy Cortez heard the noise of what he thought could have been a gun discharging and saw the patrol car one block away with the door open. At that time, he thought the patrol car was part of the perimeter around the site of the burglary. Motion, Exh. A-4 at ¶ 7; Dock. #104-5 at 3. At some point during the struggle, two passers-by, John and Dianna Montoya, stopped their vehicle at the site of the struggle. Plaintiff told Mr. Montoya, "You need to get back . . . 'cause we're fighting for a gun down here." Motion, Exh. A-2 at 72; Dock. #104-3 at 23. The Montoyas drove one block to where Defendant Deputy Cortez had detained another individual believed to be involved in the incident (it was later determined that he was not) and advised Deputy Cortez that "someone with a gun and an officer were struggling on the ground and that the guy was going to shoot the police officer." Response, Exh. A-6; Dock. #111-4 at 4.

Deputy Cortez immediately drove down the street to where Deputy Hatterman and Plaintiff were struggling. On his way, Deputy Cortez broadcast on the police radio that an officer was down and that the suspect had a gun. At this time, Deputy Cortez did not know who the suspect was that was in a struggle with the officer, whether the individual was the second suspect or the individual already detained. Motion, Exh. A-4 at ¶ 15; Dock. #104-5 at 4. When he arrived at the scene, Deputy Cortez jumped from his patrol car and ran to where Deputy Hatterman and Plaintiff were struggling on the ground for control of Deputy Hatterman's gun. Deputy Cortez saw a gun

4

magazine on the ground, and it appeared to him that Plaintiff and Hatterman were in a "life and death struggle." *Id.* at ¶ 11.

Plaintiff agrees with this characterization of the struggle and testified that, when Deputy Cortez arrived, Plaintiff was biting Deputy Hatterman's hand, biting as hard as he could, and trying to pull the gun away from him. Motion, Exh. A-2 at 78; Dock. #104-3 at 27. Deputy Hatterman was on the ground, and Plaintiff was on his knees. Although Plaintiff disagrees with this statement and claims that both he and Deputy Hatterman were on the ground, he testified at his deposition that he was on his knees when Deputy Cortez arrived. *Id.* He also relies on Deputy Cortez's statement that he yelled at Plaintiff to get off of Deputy Hatterman. Supplemental Response at ¶ 3; Dock. #112 at 2. In his affidavit, Deputy Cortez states that Plaintiff appeared to be physically bigger than both Hatterman and himself and that the two were struggling over something, which he believed to be Deputy Hatterman's gun. Motion, Exh. A-4 at ¶¶ 11, 12; Dock. #104-5 at 4. Plaintiff disputes Deputy Cortez's statements, but submits no evidence to contradict Deputy Cortez's beliefs, other than to state that Plaintiff was 170 lbs. at the time and is 5'6" tall. Response, Exh. A-1 at ¶ 27; Dock. #111-3 at 8.

As Deputy Cortez approached the pair with his weapon drawn, he ordered Plaintiff to show his hands. David Lake, the individual Cortez had detained one block away and who was now in the back of Cortez's patrol car, stated that, in response to Cortez yelling show me your hands, he saw an individual come up from the ground and onto his knees and raise his hands in the air. Response, Exh. A-6 at ¶¶ 6, 7; Dock. #111-4 at 5. While the individual (Plaintiff) was on his knees, Deputy Cortez kicked him in the face and body repeatedly. *Id.* Deputy Cortez states that he kicked Plaintiff one to three times in the face/upper extremities to get Plaintiff off of Deputy Hatterman and several

more times in the upper extremities to keep Plaintiff on the ground. Motion, Exh. A-4 at ¶ 14; Dock. #104-5 at 4. Deputy Cortez stated that he did not tackle Plaintiff because of the report that a suspect had a gun and was going to shoot the officer. *Id.* at ¶ 15.

Plaintiff testified that, when Deputy Cortez ordered him to show his hands, he came up on his knees, raised his hands in the air, and did not resist anymore. Plaintiff describes Deputy Cortez's arrival on the scene as follows:

> A: Okay, At this point, I'm biting Deputy Hatterman's hand, right around this region right here (indicating). I'm biting as hard [as] I can. I'm trying to pull this gun away from him.
>
> At that point, I hear a vehicle pull up, skid to a stop. I look, and there's a deputy coming out of the car. The deputy has his gun drawn. He yells at me, "Show me your hands, show me your hands." I look at Deputy Hatterman. I still got possession of the gun. I look at Deputy Cortez. He's got his gun and he's pointing it at me. It's a no-brainer. . . .
>
> Q: Can I ask you to clarify what you mean when you say it was a no-brainer?
>
> A: Yeah. That when an officer tells you "Show you (sic) your hands, show you (sic) your hands" and he's pointing a gun at you, you raise your hands, show him your hands. And I did. I was cuffed in the front, raised my hands, I'm on my knees.

Response, Exh. A-3 at 78; Dock. #111-3 at 22.

Deputy Cortez testified that, after he got Plaintiff onto his stomach, Plaintiff continued to resist Deputy Cortez's efforts to keep him on the ground. Motion, Exh. A-4 at ¶ 16; Dock. #104-5 at 4. Plaintiff testified that he lost consciousness at some point and does not remember how he ended up on his stomach, but that the next thing he remembered was being tased by Sergeant Totten. Response, Exh. A-3 at 87, 89; Dock. #111-3 at 24, 25. Deputy Cortez stated that his interaction with Plaintiff lasted "a matter of seconds." Motion, Exh. A-4 at ¶ 17; Dock. #104-5 at 4. Plaintiff disputes the length of this interaction but testified that he was "blurred" and semi-conscious after

6

Deputy Cortez kicked him the first time. Response, Exh. A-3 at 88; Dock. #111-3 at 25.

Plaintiff was eventually re-cuffed behind his back and taken from the scene in an ambulance. Later that day, he was medically cleared for jail and released from the hospital. By this time, he was "ambulatory without further complaints." Motion, Exh. A-3; Dock. #104-4 at 6. Plaintiff does not remember any of the details of his treatment, though he does remember informing the paramedics that he "did some meth." Response, Exh. A-3 at 96, 100; Dock. #111-3 at 26, 27. Plaintiff pleaded guilty to disarming a peace officer, burglary, and a habitual criminal count based on the events of December 7, 2004, and he was sentenced to 24 years in prison.

## II. Discussion

### A. Legal Standard for Motion to Dismiss and Summary Judgment

A motion to dismiss should be granted only if the plaintiff has "failed to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In doing so, all well-pleaded factual allegations in the Complaint must be taken as true and viewed in the light most favorable to the non-moving party. *GFF Corp. v. Assoc. Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). The Court must review the Complaint to determine whether it contains "enough facts to state a claim to relief that is plausible on its face." *Anderson v. Suiters*, 499 F.3d 1228, 1232 (10th Cir. 2007) (citations omitted). This minimal standards requires the plaintiff to establish "a reasonable likelihood of mustering factual support for these claims," *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), by "sufficiently alleg[ing] facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

A motion for summary judgment serves the purpose of testing whether a trial is required.

*Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Id.* at 323; *Maldonado v. City of Altus*, 433 F.3d 1294, 1302 (10th Cir. 2006). If the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. *Hysten v. Burlington Northern and Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002); Fed. R. Civ. P. 56(e). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56©, except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Finally, "[t]he court views the record and draws all favorable inferences in the light most favorable

to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1256 (10th Cir. 2005).

B.     *Pro se* **Pleadings**

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted). The Court should not be the *pro se* litigant's advocate. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A dismissal "without affording the plaintiff notice or an opportunity to amend is proper only 'when it is patently obvious that plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile.'" *Curley v. Perry*, 246 F.3d 1278, 1281-82 (10th Cir. 2001) (quoting *Hall*, 935 F.2d at 1110 (additional quotation marks omitted)).

C.     **Whether Plaintiff's Claim is a Collateral Attack on his Guilty Plea**

The United States Supreme Court in *Heck v. Humphrey* barred state prisoners from seeking relief for constitutional violations if the plaintiff's claims would render a conviction invalid. 512 U.S. 477 (1994). The Court held:

> [W]hen a state prisoner seeks damages in a suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id.* at 487. Here, Plaintiff pleaded guilty to disarming a peace officer pursuant to Colo. Rev. Stat. § 18-8-116, which provides, "[a] person commits disarming a peace officer if he knowingly, without

9

justification and without consent, removes the firearm of a peace officer who is acting under color of his official authority." Thus, Plaintiff has admitted that he obtained possession of Deputy Hatterman's gun without justification.

Whether this bars Plaintiff's claim against Deputy Cortez is another matter. Defendant relies on *Adams v. Dyer*, 223 Fed. Appx. 757 (10th Cir. 2007), for the proposition that Plaintiff's conviction for disarming a peace officer bars a claim for excessive force for the officer's actions in subduing Plaintiff. The plaintiff in *Adams* sued three arresting officers for excessive force after he was convicted of assault and resisting arrest. As to the two officers for whom the plaintiff was convicted of assaulting, the Court found that for the plaintiff to claim that they assaulted him without provocation would call into question his conviction for assault, by necessarily implying that he did not assault the officers. As to the third officer, the Court noted that the record did not indicate whether plaintiff's interaction with him was part of the underlying state charges and concluded that the claims were not barred under *Heck*.

In the present case, Plaintiff's conviction for disarming a peace officer clearly applies to his conduct with Deputy Hatterman during the struggle. It is not as clear whether it applies to Deputy Cortez. For example, the Tenth Circuit held in *Martinez v. City of Albuquerque*, 184 F.3d 1123 (10th Cir. 1999), that a conviction for resisting arrest did not preclude a claim for excessive force, because the officers could have used excessive force in ending the plaintiff's resistance. *Id.* at 1126. In doing so, the Court noted that, at the conclusion of the criminal trial, the court viewed the case as having two separate parts: the first part involved the events leading up to the officer's attempts to place the plaintiff in custody (the resisting arrest); and the second part involved the officer's actual efforts to place the plaintiff in custody. *Id.* Such a distinction was possible because the state

court "noted that whether Martinez resisted arrest by initially fleeing the scene is a question separate and distinct from whether the police officers exercised excessive or unreasonable force in effectuating his arrest." *Id.*

Here, such a bright line distinction cannot be made, though Plaintiff purports it can. When Deputy Cortez arrived on the scene, Plaintiff was in possession of the gun and was engaged in a "life and death struggle" with Deputy Hatterman. Plaintiff attempts to create a bright-line distinction between this conduct and his interaction with Deputy Cortez by claiming that he stopped struggling and raised his hands. Deputy Cortez, however, testified that, within a matter of seconds, he kicked Plaintiff who was on his knees to get him on the ground, thereby placing Plaintiff's actions of disarming a peace officer and Deputy Cortez's actions of kicking Plaintiff within mere seconds of each other. For this reason, Defendant argues that Plaintiff's claim against Cortez is "inextricably intertwined" with Plaintiff's conviction. Motion at 17 (citing *Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005). Yet the plaintiff in *Cummings* brought a claim for excessive force against the officer that he was convicted of assaulting. And while temporal proximity is relevant to whether the guilty plea precludes Plaintiff's claim, the dispositive question is whether the elements of the crime for which the Plaintiff was convicted contradict elements of this Defendant's defense. *See Adams*, 223 Fed. Appx. at 761; *Martinez*, 184 F.3d at 1126; *DiJoseph v. City of Philadelphia*, 947 F. Supp. 834, 841 (E.D. Pa. 1997). Thus, *Cummings* does not appear to provide dispositive guidance for Plaintiff's claims against Deputy Cortez.

Under the facts of this case, the Court cannot say that holding Defendant Cortez liable for excessive force would "necessarily imply" that Plaintiff's conviction was invalid. By pleading guilty to disarming a police officer without justification, Plaintiff has admitted that he had no reason

11

to take possession of the gun. He has not admitted that he in any way resisted Deputy Cortez's attempts to subdue him, and Defendant has not provided a copy of Plaintiff's allocution in conjunction with his guilty plea for this Court to state conclusively that the conviction can preclude Plaintiff's claim against Cortez. Although this presents a close question, the Court concludes that Defendant has not met his burden to prove that Plaintiff's claim against Deputy Cortez is barred by *Heck v. Humprey*, and he is not entitled to summary judgment on this basis.

### D. Plaintiff's Claim of Excessive Force against Defendant Cortez.

Even if Plaintiff's claim is not barred by *Heck v. Humphrey*, Defendant Cortez argues that he is entitled to qualified immunity on Plaintiff's claim of excessive force. Qualified immunity protects government officials performing discretionary functions from individual liability under 42 U.S.C. § 1983, unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

> In evaluating a claim for qualified immunity, the court must first determine whether, considered in the light most favorable to the plaintiff, the facts alleged state the violation of a [statutory or] constitutional right. . . . If so, the court must go on to determine whether the [statutory or] constitutional right was clearly established at the time of injury. . . . If the answer to either of these questions is no, the defendant is entitled to qualified immunity.

*People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1207 (10th Cir. 2002) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). Thus, Plaintiff must first establish a violation of a constitutional right before this Court must determine whether that right was clearly established at the time of violation.

In this case, Plaintiff claims that Defendant violated his Fourth Amendment right to be free from unreasonable seizures by using excessive force during his arrest. To determine whether the force used by Defendant was reasonable, the Court must consider "whether the officer['s] actions

12

are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to [his] underlying motive or intent." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Motive is not at issue because "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* Further, the conduct must be viewed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (quoting *Graham*, 490 U.S. at 396)).

In weighing the facts and circumstances confronting the officer to determine whether the use of force was objectively reasonable, the Court considers the following three factors: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (3) whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, *quoted in Casey v. City of Federal Heights*, 509 F.3d 1278, 1281 (10th Cir. 2007).

Here, all three factors weight in favor of the use of force. First, Plaintiff was arrested for burglary of a residence and had been taken by Deputy Hatterman from the scene of the crime. Second, at the time that Deputy Cortez arrived on the scene, he had heard that a second suspect was armed, and he had been informed by the Montoya's that an individual with a gun was about to shoot an officer. When Deputy Cortez came upon Plaintiff and Deputy Hatterman, the two were struggling for control of Deputy Hatterman's gun. Plaintiff admitted in his deposition that, at this time, he had possession of Deputy Hatterman's gun, thus posing an immediate threat to the safety of the officers. Finally, from the perspective of Deputy Cortez, Plaintiff was clearly resisting Deputy Hatterman.

In weighing the facts and circumstances of this case, the Court is also mindful that Deputy Cortez had heard the gun discharge shortly before being informed of the struggle; Deputy Cortez knew that deputies were looking for a second suspect with a gun; Plaintiff was in the act of disarming a police officer and had possession of the gun at the time that Deputy Cortez arrived on the scene; and Deputy Cortez exercised his judgment in kicking Plaintiff rather than shooting Plaintiff. For Deputy Cortez to instead kick Plaintiff to move him away from Deputy Hatterman and to subdue him was an objectively reasonable response to end Deputy Hatterman's "life and death struggle."

Plaintiff disputes the timing of these events and argues that he felt safe when Deputy Cortez arrived, and that he stopped resisting. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly support motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Estate of Larsen*, 511 F.3d at 1261 (citations and quotations omitted). Plaintiff's disputed facts are not material to the totality of the circumstances as described above, because these facts must be viewed from the perspective of the officer at the time, not in hindsight. Whether Plaintiff was on his knees when Deputy Cortez arrived or raised up after he arrived, Deputy Cortez took advantage of the opportunity to end the struggle for possession of the gun and to end the obvious and inherent danger to Deputy Hatterman posed by Plaintiff's possession of the gun. Notably, deadly force has been found to be reasonable when a suspect has possession of the officer's gun and is engaged in a struggle. *Henning v. O'Leary*, 477 F.3d 492, 496 (10th Cir. 2007) ("Deadly force, which O'Leary employed in this case, is reasonable where an officer has reasonable cause to believe that the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed

14

a violent crime.").

Even viewing the facts in a light most favorable to the Plaintiff, that he raised his hands in the air and had no intention of resisting Deputy Cortez, Deputy Cortez's split-second decision to ensure Plaintiff was no longer a threat or within reach of the gun by kicking him and keeping him on the ground is reasonable, particularly in light of Plaintiff's admission that he had possession of the gun when Deputy Cortez arrived on the scene, thus posing an immediate danger to Deputy Hatterman and others. Deputy Cortez's decision to use non-lethal force to take control of this dangerous situation and end it once and for all and eliminate any further threat that Plaintiff was feigning submission was objectively reasonable under the facts and circumstances of this case. Accordingly, Defendant Cortez is entitled to qualified immunity for Plaintiff's claim of excessive force, and summary judgment is appropriate.

Finally, Plaintiff argues for the first time in his Response that Deputy Cortez is liable for failing to stop Sergeant Totten from tasering Plaintiff. Response at 15; Dock. #111; Supplemental Response at ¶ 6; Dock. #112 at 3. Plaintiff also requests that he be allowed to amend his complaint, if this claim was not sufficiently stated in his complaint. *Id.* Plaintiff does mention this claim or any supporting allegations in his complaint, and he has not filed a motion to amend his complaint. Plaintiff also does not include these allegations in the Amended Final Pretrial Order. Dock. #102. Pursuant to D.C.Colo.L.Civ.R. 7.1.C, a motion cannot be included in a response. Thus, this issue is not properly before the Court.

### III. Conclusion

Accordingly, for the reasons stated above, the Court RECOMMENDS that Defendant Cortez's Motion to Dismiss and/or Motion for Summary Judgment [Filed February 5, 2008; Docket

#104] be **granted**, because Defendant Deputy Cortez is entitled to qualified immunity on Plaintiff's claim. Under Fed. R. Civ. P 72, the parties shall have ten (10) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.[1]

Dated at Denver, Colorado this 5th day of May, 2008.

BY THE COURT:

s/ Michael E. Hegarty
Michael E. Hegarty
United States Magistrate Judge

---

[1] The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive, or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within ten (10) days after being served with a copy of this Recommendation may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991); *Niehaus v. Kansas Bar Ass'n*, 793 F.2d 1159, 1164 (10th Cir. 1986).